FILED   LODGED
RECEIVED

MAY 21 2010

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
DEPUTY

May 21, 2010

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

**Campbell, William W.** *pro se*                )
                                                                  )
                    Plaintiff,                       )          **Complaint**
                                                                  )
v.                                                         )
                                                                  ) Civil Action No.: C10-851 MJP
**UNITED STATES**                          )
**OF AMERICA,**                              )
                                                                  )
                    Defendant.                     )
                                                                  )

### Parties to this Complaint

William W. Campbell
PO Box 1994
Shelton WA  98584
(360) 426-1703

Office of the Attorney General
Department of Justice
Room B-103
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

U.S. Attorneys Office
700 Stewart Street
Suite 5220
Seattle, WA 98101-1271

**10-CV-00851-CMP**

Department of Veteran Affairs
Office of General Counsel (021B)
810 Vermont Avenue N.W.
Washington D.C. 20420

44       William W. Campbell, ("Campbell"), proceeding *pro se*, brought this suit

45   against the defendant, the United States of America, ("the Government"), under the

46   Federal Tort Claims Act, ("the Act"), 28 U.S.C. § 2671 *et seq.*, seeking damages for the

47   alleged sexual misconduct by an employee of the Department of Veterans Affairs

48   Puget Sound Health Care System, ("VA Puget Sound").  This court has exclusive

49   jurisdiction over the matter based upon 28 U.S.C. § 1346(b)(1).  The undersigned

50   now submits the following complaint.  Since termination of the relationship with

51   Lori F. Phelps ("Phelps"), Campbell alleges to have suffered mental anguish, erectile

52   dysfunction, and depression to such a degree that Mrs. Campbell ("Wife") was

53   forced to leave her place of employment to become a full-time caregiver.  In

54   addition, Campbell no longer trusts clinicians, particularly female clinicians, and

55   requires any treatment to be from a male.

57                                  *1. Facts*

59       Campbell is a 100% disabled Operation Iraqi Freedom Veteran with Post

60   Traumatic Stress Disorder ("PTSD") and Traumatic Brain Injury ("TBI").  Both cause

61   occupational and social impairment, cognition impairment, and the ability to make

62   reasonable or rational decisions.

63       Campbell filed an administrative tort claim with the Department of Veterans

64   Affairs, (VA), in Seattle, Washington and claimed he'd been the victim of alleged

65   sexual misconduct/abuse by a VA employee.  In a Standard Form 95, ("SF95"), dated

66   May 9, 2009, Campbell alleges that during a period of hospitalization for PTSD

67   beginning September 12, 2005 and continuing through June 20, 2007 with a

68   different outpatient psychologist, he was the victim of sexual misconduct/abuse.

69   The alleged victim claims that during hospitalization the Intern Psychologist

70   assigned to treat him initiated an inappropriate relationship.  Following

71   hospitalization, Campbell alleges he notified his outpatient psychologist, Kimber

72   VanGoda ("VanGoda"), of the relationship with the Intern, outside the clinical

73   environment.  "I have a vague memory of you [and Phelps] emailing and something

74   about having photography in common." (Vangoda email)  Campbell claims the

2

75   relationship ultimately became sexual.

76        In the complaint form, Campbell identifies Phelps, an employee at the Seattle
77   Veterans Hospital, (VAMC), as the person responsible for the alleged misconduct. As
78   a result, Campbell sought $1,500,000.00 in damages. (Mental Anguish etc.)
79   However, on September 30, 2009, Campbell was given notice that his claim was
80   denied. Veterans Affairs initiated an investigation into the behavior of Phelps but
81   prior to the completion of that report, Campbell's Request for Reconsideration was
82   also denied on January 8, 2010.

83        Campbell claims Phelps was assigned to him while hospitalized at the Seattle
84   VAMC PTSD ward, ("*7 West*"). Phelps was employed as an unlicensed Post-Doctoral
85   Intern and was treating Campbell, in lieu of a certified psychologist, as a therapist.
86   Each day, during daily counseling sessions, Campbell shared personal information
87   about himself as anyone does who seeks treatment for psychological problems. In
88   these sessions that lasted anywhere from 15 minutes to and hour, Campbell detailed
89   his problems associated with his experiences in Iraq. He also shared stories of
90   childhood neglect and abuse, including sexual abuse, experiences he had not shared
91   with anyone before. It was an extremely emotional experience for both Campbell
92   and Phelps. She listened to Campbell and showed intense emotion, reacting to the
93   events of Campbell's life by openly crying. As the daily sessions progressed, Phelps
94   shared her own personal stories. She told Campbell of her marital problems, her
95   love of marathons, the kind of music she liked, the types of books she liked to read,
96   and much more. Campbell claims, the emotions Phelps displayed, and her
97   willingness to share her own stories, helped him to open up in a way Campbell had
98   never done before. Her early feelings for him were clearly stated in a hand written
99   card from Phelps.

100           When I met you, almost from the start I knew I did not want to be detached
101           from you. So when we started talking on the phone every day in the fall and
102           hanging out every couple of weeks, I felt more alive and engaged and exited
103           than I can ever remember. (Phelps Card to Campbell)

104        Campbell felt as though Phelps cared about him, unlike anyone else in his life
105   at the time. Near the end of his hospitalization, Campbell claims that he and Phelps

106    discussed the "special connection" they shared. When discharged, Campbell wrote a
107    personal message inside a favorite book entitled "Silk" and gave it to Phelps.
108    Campbell claims that Phelps accepted the gift.

109         Showing intense emotion, sharing her personal life, and allowing Campbell to
110    give Phelps gifts, all led Campbell to believe they shared a level of intimacy that
111    went beyond a simple patient/therapist relationship. Acknowledging a "special
112    connection" simply confirmed what had already been displayed through her actions.

113         Campbell asserts inadequate supervision of Phelps during his hospitalization
114    likely left Phelps without appropriate guidance. Dr. McCutcheon ("McCutcheon")
115    was Phelps direct supervisor. Phelps told McCutcheon of two emails, but she
116    continued to receive, and respond to many more without communicating this fact to
117    her supervisor.

118         During Campbell's hospitalization at the Seattle VAMC, McCutcheon was
119    absent 10 of the 17 days and unavailable to provide direct supervision.  Dr. Kothari
120    ("Kothari") was his replacement while absent.  While away, McCutcheon believed
121    one-on-one supervision was being conducted on a regular basis, but Kothari
122    testified she only provided it when requested. (Kothari Testimony, pp.10-11)
123    Kothari further testified to not knowing the rules regarding supervision of Interns.
124    (Kothari Testimony, p.17) When Dr. McCutcheon was present, Phelps received daily
125    one-on-one supervision time. (McCutcheon Testimony, pp.69-70)  When he left for
126    10 days, Phelps was without guidance, receiving only multidisciplinary group time
127    in the mornings.

128         Phelps was a new Intern, joining *7 West* the last week of August.
129    (McCutcheon Testimony, p.19) Campbell checked into *7 West* on September 12,
130    2005. This meant for 10 of the 17 days he was hospitalized, Phelps practiced
131    without regular supervision.

132         Campbell alleges that once he was discharged from the Seattle VMAC on
133    September 12, 2005 he discussed his feelings regarding Phelps with his outpatient
134    therapist, VanGoda.  Campbell asserts Vangoda didn't fulfill her reporting

4

135  responsibilities regarding his disclosure by failing to inform supervisors or properly
136  documenting in her official *Progress Notes*.
137       Once Phelps had the opportunity to read the book Campbell provided to her
138  while inpatient at the Seattle VAMC, she had romantic feelings towards Campbell.
139  Prior to that time, Phelps was not certain exactly what her feelings were. (Phelps
140  Testimony, p.21)
141       Campbell alleges that Phelps contacted him using an old University email
142  address, Phelps insists he contacted her, regardless how it happened, an extended
143  period of on and off telephone and email communication began.  The content of the
144  communications became increasingly intimate.  Campbell does not claim the
145  conversations were one sided.  Campbell does assert that Phelps encouraged, even
146  pressed for his involvement.  In some of these emails, the Campbell alleges Phelps
147  requested he visit Bondage websites. (Email: Links – Jan 18, 2007)  This type of
148  communication between Campbell and Phelps continued for months until they
149  began to meet face-to-face.  Campbell alleges they met for the first time in Tacoma
150  Washington.  During their meetings in Tacoma, they'd meet at city parks, coffee
151  shops, restaurants, and park-n-rides.  They also met frequently in Olympia
152  Washington at various restaurants and bars.  Campbell and Phelps always met
153  whenever Campbell had appointments at the Seattle VAMC where Phelps was still
154  employed.  Phelps has corroborated these meetings. (Phelps testimony, p.46)
155       Very shortly after being released from the VAMC in Seattle, Campbell
156  discussed the Phelps relationship with VanGoda during bi-monthly sessions.  It was
157  clear to VanGoda at the time that communication was occurring between the two.
158  In e-mails dated July 15, 2009, VanGoda acknowledges the interaction.  VanGoda
159  verifies the Campbell and Phelps relationship during session was reconfirmed
160  during testimony given on February 9, 2010. (p.25)  VanGoda made no mention of
161  Campbell's disclosure in Progress Notes, nor did she bring the matter to the
162  attention of her supervisor.
163       As the Campbell and Phelps relationship continued, Campbell became
164  increasingly uncomfortable. (Campbell Testimony, p. 11)  Campbell asserted Phelps
165  pressured him to continue the relationship.  Campbell wanted help and sought

5

166  counsel from VanGoda.  On several different occasions, over a period of 15 to 20
167  months, Campbell asked VanGoda for advice on an ethical issue regarding a VA
168  employee.  Campbell wanted to get information without disclosing names.  Campbell
169  had no idea what would happen to him or others involved and wanted get the advise
170  in a safe manner.  Each time he was told the same thing.

171  "Vet had asked this writer a number of times over the past couple of
172  years what she (VanGoda) would have to do ethically were he to tell
173  me something about a fellow VA employee that went against
174  ethical/legal standards.  At the times he asked, this writer replied
175  that it would likely have to be reported" (VanGoda, May 5, 2009).

176  To obtain her answer, VanGoda spoke with Patient Advocate Helbig.  On an
177  earlier attempt to seek advice, the response was not what Campbell expected.

178  "...we have had several similar situations in the past where others
179  felt the patient was not receiving what was needed but when we
180  contacted the Veteran, there were pieces of the story that the person
181  with the concern did not have in order to understand the full
182  picture." (Helbig, July 1, 2008).

183  Once Campbell received this message, forwarded by VanGoda, he felt fearful
184  he would not be believed or supported and therefore dropped the issue.  Because
185  Campbell felt trapped in a bad situation, he brought the same issue up a few other
186  times but had the same result.

187  In the investigation dated March 30, 2010, Acting Director DeAnn Lestenkof
188  ("Lestenkoff") concludes that information given to Campbell by VanGoda
189  inaccurately lead him to believe it was unsafe to report his abuse.  This in turn may
190  have delayed Campbell's report of the abuse.  Campbell asserts this is exactly what
191  occurred.  Multiple attempts were made to report the abuse, but were discouraged.
192  ("LestenKoff", p.6, "VanGoda", pp.17-18 )

193  Even though Campbell was upset about the relationship with Phelps, he felt
194  he had no choice except to participate.  He felt worthless and didn't deserve to be
195  happy.  Campbell simply resigned himself to what he felt he deserved, to be abused.
196  (Campbell Testimony, pp. 10-11)

197   Campbell alleges the first sexual contact with Phelps in late 2006, November

198   or December. (Phelps Testimony, p. 47)  Campbell recalls the last occurrence was

199   when Phelps came to his home on April 8, 2007 with wine, crackers, and cheese. He

200   believes this was the date because there was no one else at home because it was

201   Easter Weekend. (Campbell Testimony, p. 10)

202   Phelps going to his home was too much for Campbell.  He tried to distance

203   himself from Phelps by not returning phone calls or answering emails.  (Campbell

204   Testimony, p.11)  This became problematic for Campbell when Phelps became

205   distraught, forcing Campbell to contact her by expressions of sadness.

206   Phelps was offered a job in Wisconsin and Campbell encouraged her to take

207   it.  Campbell saw it as a way to end the relationship for good.  Since Wisconsin was

208   her home state and was a position within VA she was interested in she agreed to

209   take the job.  Campbell alleged to have last seen Phelps on June 20, 2007.  Phelps

210   contacted Campbell and requested the meeting to say goodbye.  Campbell met

211   Phelps in a Tacoma parking lot.  (Campbell Testimony, p.12)  Since Phelps was

212   planning on taking lessons, Campbell gave her a guitar he owned but didn't use as a

213   going away gift.  She is now employed at the William S. Middleton VAMC in Madison

214   Wisconsin.

215   Phelps continued to contact Campbell through email over a year after leaving

216   the Seattle VAMC.  Phelps stopped in December 2008 when Campbell began asking

217   her questions about her motives. (Phelps Testimony, p. 56)

218   Campbell

219   "Boiled down to it's simplest form, under any circumstances, 'Does a

220   psychologist have sex with a patient?'... I was drugged and acted "outside

221   normality' for me."

222   Phelps

223   "You're right.  A psychologist should not do that under any circumstances...I

224   was a very guarded, closed down person for a long time.  There was

225   something about you that woke me up, which was surprising and caught me

226   off guard.  Especially after you gave me that book.  But having feelings for

227   you is not a good reason, I know." (Email: December 28, 2008)

228    Campbell could not come to terms with why he felt so bad and was unable to
229    forget how a former psychologist treated him.  The shame and guilt that Campbell
230    felt and his unwillingness to share the details of the Phelps relationship with his
231    wife caused him to become withdrawn and depressed to the point that his wife
232    knew there was something seriously wrong.  Working through a few days of intense
233    emotional turmoil, Campbell was finally able to unburden himself by sharing the
234    news of Phelps' abuse with his wife.  It was through this process that both Campbell
235    and his wife realized the depth of the unethical and immoral behavior exhibited by
236    Phelps.

237    With that realization, Campbell contacted American Lake VAMC who told
238    Campbell the appropriate way to file a complaint was to use the SF95.

239    Once Campbell made the decision to lodge his complaint, he felt free to
240    discuss the abuse with VanGoda without fear and get treatment for the mental
241    damage done by Phelps.  When Campbell told VanGoda, he was nervous and full of
242    anxiety but he also had a sense of relief.  (VanGoda Testimony, pp. 18-19).   Because
243    of Campbell's history, VanGoda knew he'd believe he needed a friend.  Knowing
244    Campbell's history of abuse and previous contact with Phelps, VanGoda's exact word
245    in response to Campbell's confession was, "I'm not surprised."  This is illustrates
246    that VanGoda was aware, or at least suspected there was a relationship between
247    Campbell and Phelps.

248    VanGoda made a notation in Campbell's disclosure in his Progress Notes then
249    notified her supervisor, Dale Smith ("Smith").  Beyond communicating the issue to
250    Smith, VanGoda also brought it to the attention of the American Lake Intern
251    Training Director, Amy Morris ("Morris") for the purpose of improving training
252    materials.  Neither Smith nor Morris took action once being notified by VanGoda.
253    VanGoda's assumed, Campbell would do his own reporting and no additional staff
254    reporting needed to be done. (VanGoda Testimony, p. 20)  Campbell asserts, failure
255    of VanGoda, Smith, and Morris to report delayed treatment thereby allowing further
256    injury to Campbell.

257    Fearing Phelps would attempt to contact Campbell, he attempted to get a No
258    Contact order with the Mason County District Court but Phelps sent and attorney to

259   stop the action.  The attorney representing Phelps stated there had been no contact
260   between Campbell and Phelps since 2008, therefore a No Contact order was not
261   justifiable.
262        Campbell alleges that Phelps began Cyber Stalking him by accessing various
263   websites maintained by both himself and his wife Domenica Campbell. ("Mrs.
264   Campbell")  Campbell is not certain exactly when the stalking began but Mrs.
265   Campbell discovered Phelps stalking on May 7, 2010 through the use of a Blogging
266   program called "*Analytics*."  Analytics cannot trace access prior to its installation on
267   the user's computer, but Mrs. Campbell was able to determine that Phelps was
268   already accessing Mrs. Campbell's Blog on March 20, 2010, when *Analytics* was
269   installed.
270        Mrs. Campbell's Blog is entitled "*The Combat Veteran Spouse: Living in the*
271   *Shadow of PTSD.*"  In her Blog, Mrs. Campbell discloses life struggles living with a
272   man with combat PTSD.  Personal details of our lives are discussed openly with
273   friends and family, they in turn provide support and advice.  Without our
274   knowledge, Phelps was accessing the site nearly every day, and her attorney was
275   accessing it intermittently.  Feeling emotionally stressed and personally violated by
276   her prying into our lives after past sexual abuse, Mrs. Campbell posted an
277   anonymous note asking her to stop accessing the site.  Both her and her attorney
278   continued.
279        Feeling very distress, Campbell contacted Spataro (May 10, 2010) at VA and
280   the Emergency hotline in a desperate attempt to get someone to get Phelps to stop.
281   Mrs. Campbell contacted the Executive Office and the Seattle VAMC describing the
282   problem and Campbell's distress.  On May 11, 2010, Chief Gerald Casey contacted
283   Mrs. Campbell and ensured her that he would contact the Wisconsin VA, as well as
284   look into other legal considerations.
285        Failing to hear anything back from Spataro, the Emergency Hotline or Chief
286   Casey, and fearing continued escalation in mental anguish, Campbell and Mrs.
287   Campbell cancelled their Blogs, Facebook, MySpace, Wounded Warrior and Flickr
288   accounts.  Mrs. Campbell deleted all her YouTube uploads.
289

290
291
292       *II. Analysis*

      An administrative Investigative Board summary report of alleged inappropriate conduct of Psychology Intern/Fellow Phelps with Campbell while at VA Puget Sound Health Care System in accordance with VA Handbook 0700 was conducted. This investigation was convened by Acting Director Dewayne Hamlin's charge letter dated January 28, 2010. The report was extended to perform a thorough legal review with respect to recommendations and conclusions as outlined in the summary report.

      The allegation that Phelps did engage in an inappropriate relationship with Campbell in her capacity as an employee of VA Puget Sound Healthcare System, September 2005 through June 2007 was sustained [by VA]. Phelps left the Seattle VAMC in June 2007, but continued her employment with VA at the Madison (WI) VAMC. Her contact with Campbell continued through December 2008.

      Phelps testified that she and Campbell began a benign email relationship a few weeks after discharge from *7 West* in August 2005. Phelps testified that her relationship with Campbell became sexual around November – December, 2006 while she was in her first Fellowship year at VA Puget Sound. (Phelps Testimony, p. 47)

      Phelps testified that she maintained an email relationship with Campbell after she moved to Madison, WA in June 2007 and continued to communicate with him through December 2008. (Phelps Testimony, pp.47-55) In an email dated December 27, 2008 titled "Question," Campbell stated that Phelps acknowledged "early on how unethical it was" for her to engage in any type of relationship with him. In her response to this email, Phelps stated, "I honestly don't know what was going through my mind." In an email dated December 28, 2008, Phelps responds to Campbell's questions about why a psychologist has sex with a patient with the following comment, "You're right. A psychologist should not do that under any circumstances.

10

319    Washington State Administrative Code ("WAC") 246-16-100 prevents any
320    type of sexual contact between a "health care provider and a former patient or client
321    for a period of two years after the provider-patient relationship ends." Even though
322    Phelps was an intern and then a Fellow during this time frame, as long as she was
323    practicing in Washington, her conduct would be governed by the WAC.
324    Membership in the American Psychological Association ("APA") commits
325    members and student affiliates to comply with the standards of the APA Ethics Code.
326    Lack of awareness or misunderstanding of an Ethical Standard is in itself not a
327    defense to a charge of unethical conduct. The Code prohibits "sexual intimacies with
328    former clients/patients for at least two years after cessation or termination of
329    therapy," and after that only "in the most unusual circumstances." (*APA Code 10.08*)
330    Phelps sexual relationship with Campbell was well within that prohibited two-year
331    period.
332    On January 14, 2010, Mrs. Campbell started a Blog entitled "*The Combat*
333    *Veteran Spouse - Living in the Shadow of PTSD*." The Blog focuses on the Campbell's
334    life together. On March 20, 2010, Mrs. Campbell installed Google Analytics (a free
335    service provided by Google to provide website statistics). Using this service on May
336    7, 2010, Mrs. Campbell discovered that Phelps had been monitoring the Blog for
337    weeks (if not longer), visiting multiple pages, reading every detail about our life
338    posted for friends and family. Additionally, Phelps' attorney, Peterson Johnson
339    Murray, was also visiting the site. Mrs. Campbell posted a request, without using
340    any names, asking Phelps to stop. Phelps' attorney returned to the site after Mrs.
341    Campbell's request prompting her to discontinue her Blog.
342    A person is guilty of cyberstalking if he/she has intent to harass, intimidate,
343    torment, or embarrass and other person. Cyberstalking can be done anonymously
344    and need not involve conversation. (*RCW 9.61.260*) Victims of cyber stalking may
345    not even know they're being stalked. Cyber stalkers may research individuals to
346    feed their obsessions and curiosity. Cyberstalking is a gross misdemeanor or a Class
347    C felony if the offending individual is named in a no-harassment order. Phelps
348    currently has a no-harassment order filed in Mason County District Court.
349    **Scope of Employment**

11

350        Veterans Affairs determined in their March 30, 2010 investigations that
351        "Phelps did engage in an inappropriate relationship with [Campbell] in her capacity
352        as an employee of VA Puget Sound." (Completion of Investigation Certificate)  The
353        investigating committee found the inappropriate began at the Seattle VAMC in
354        September 2005 and continued through December 2008 at the Madison VAMC.

355        As a Post-Doctoral Intern, Phelps was bound by APA standards.  These
356        standards required Phelps to avoid patient contact of any kind upon termination of
357        the therapeutic relationship.  The fact there was an obligation assigned to Phelps
358        beyond the inpatient relationship requires this period to remain within the scope of
359        her employment.  There is a clearly prescribed course of action for her to follow, no
360        contact.   Phelps claims she did not read state law. (Phelps Testimony, pp.67-68)
361        She further claims she didn't receive specific training in ethics or remember being
362        given material detailing ethics obligations. (Phelps Testimony, pp.50-53)
363        McCutcheon, on the other hand, claims all Interns are provided a 30-page training
364        manual upon entry into the program.  The manual describes all policies and
365        procedures of the internship program.  McCutcheon claims to require all Interns to
366        read the manual prior to spending 5 days verbally reviewing every page.
367        Regardless of Phelps claims of being unaware of policy, it is not justification for her
368        behavior.  If anything, it is an indication of the failure of her supervisors to ensure
369        she was properly trained.

370        State law determines the definition of scope of employment.  If the State has
371        not specifically addressed the issue, the court must anticipate how the states highest
372        court would rule. *See Moorehead v. State Farm Fire & Cas. Co.*, 123 F. Supp. 2d1004,
373        1006 (W.D. Va. 2000); *see also Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27F.3d 188,
374        191 (6th Cir. 1994).  In Washington, the "Scope of Employment" has been defined.

375             You are considered to be acting within your "Scope of Employment" if you are:
376             (a) Representing your employer in an official capacity;
377             (b) On your employer's property whether on duty or not;
378             (c) Operating equipment under your employer's ownership or control;
379             (d) Delivering products or goods on behalf of your employer; or
380             (e) Acting in any other capacity at the direction of your employer.

381       As previously stated, during in-patient treatment at the Seattle VAMC, Phelps

382  emotional outbursts and sharing of personal stories increased intimacy as Campbell

383  told Phelps of his experiences in Iraq and abuse, including sexual abuse as a child.

384  Showing such intense emotion, she made Campbell feel as though she cared about

385  him unlike anyone else.  Near the end of his hospitalization, Phelps told Campbell of

386  the "special connection" she felt for him.  After the way Phelps behaved in session,

387  Campbell agreed that there was some kind of connection.  Campbell had seen many

388  psychologists over the years and never had one demonstrated the willingness to

389  open-up with personal information as Phelps did while in session.  When Campbell

390  discharged from the VMAC, he gave Phelps a favorite book of his.  Campbell asserts

391  acceptance of his gift simply increased his belief Phelps cared for him.

392  **Discretionary Function**

393       The Federal Torts Claims Act is limited by a number of exceptions pursuant

394  to which the government is not subject to suit, even if a private employer could be

395  liable under the same circumstances. These exceptions include the discretionary

396  function exception, which bars a claim 'based upon the exercise or performance or

397  the failure to exercise or perform a discretionary function or duty on the part of a

398  federal agency or an employee of the Government, whether or not the discretion

399  involved be abused.' 28 U.S.C. Sec. 2680(a).

400       In order to determine whether conduct falls within the discretionary

401  function exception, the courts must apply a two-part test established in Berkovitz v.

402  U.S., 486 U.S. 531, 536 (1988). See Kennewick Irrigation District v. U.S., 880 F.2d

403  1018, 1025 (9th Cir.'89).  First, the question must be asked whether the conduct

404  involved 'an element of judgment or choice.' U.S. v. Gaubert, 499 U.S. 315, 322

405  (1991) (quotation omitted). ' [T]he discretionary function exception will not apply

406  when a federal statute, regulation, or policy specifically prescribes a course of action

407  for an employee to follow.  In this event, the employee has no rightful option but to

408  adhere to the directive.' Berkovitz, at 535.

409       The standard regarding the behavior of psychologists at *7 West* is set by the

410  APA.  "Technique" used by Intern psychologists while in-session are as varied as

411  there are individuals.  It is difficult, if not impossible, to prescribe a course of action

412    regarding Intern behavior without a foundation based in training and supervision.
413    The VA publishes guidelines to assist agency interns, and the APA provides their
414    own guides.  *The Iraq Clinician Guide* (2d ed, June 2004) and *VA/DOD Clinical*
415    *Practice Guideline for the Management of Post-Traumatic stress* (Con# V101(93)P-
416    1633, V.1, Jan 2004) are two of these documents provided by VA, the APA provides a
417    thorough *Code of Conduct*.  Interns and Fellows within VA, rely completely on the
418    ethics policies created by APA.  Further, they are required to do so in order to
419    remain enrolled, and participate in the Seattle VAMC internship program.
420        Once the element of judgment is established, the next inquiry must be
421    "whether that judgment is of the kind that the discretionary function exception was
422    designed to shield" in that it involves considerations of "social, economic, and
423    political policy." (Gaubert, at 322-23).  Thus, the discretionary function exception
424    protects only broad policy-based actions or decisions by government employees.
425        A decision not to warn of a specific, known hazard for which the acting
426    agency is responsible is not the kind of broader social, economic or political policy
427    decision that the discretionary function exception is intended to protect. (Sutton, 26
428    F.3d at 910).
429        The discretionary function exception restores the government's immunity in
430    situations where its employees are carrying out governmental or 'regulatory' duties.
431    28 U.S.C. S 1346(b), (See 138 Cong. Rec. S13982-01, *S14010). (daily ed. Sept. 18,
432    1992).  Accordingly, if the government can prove that the actions taken by its
433    employees consisted of the unique functions and responsibilities of the government,
434    then the government cannot be held liable under the FTCA even if a private
435    individual would be held liable. See H.R. Rep. No. 1015, 101st Cong. 2nd Sess. 134
436    (1991).  In this case, following termination of mental health service by VA, Campbell
437    sought professional mental health care in the private sector at personal expense.
438    After three months of external therapy, VA discovered Campbell's usage of external
439    therapy and began paying for it for him.  Therefore, it is clear a private individual is
440    capable of performing the same function.
441        The techniques Phelps used while Campbell was under her care ultimately
442    led to a sexual relationship.  Regarding policy, Phelps had little choice but to follow

14

443  established direction.  Phelps was not, however, observed in session to make

444  needed adjustments.  VA was negligent for not providing supervision appropriate

445  for Phelps' position and level of responsibility.

446        Campbell alleged daily sessions with Phelps were never attended or spot-

447  checked by a supervisor and her frequent visits to his hospital room were never

448  monitored.  It is not reasonable to assume a supervisor can have an accurate

449  understanding of an intern's behavior without direct observation.  Phelps behavior

450  while in session, while an effective tool to get Campbell to express himself, was

451  inappropriate because it created intimacy between them.  Campbell asserted that a

452  seasoned, licensed psychologist would have recognized the potential of harm her

453  behavior.

454        Campbell asserts the American Lake VAMC was negligent when, shortly after

455  being released from the hospital, he spoke with VanGoda about contact with Phelps.

456  VanGoda failed to follow established policies and report her findings as well as

457  document it in Campbell's Progress Notes, with a co-signatory.

458  **Place of Offense**

459        "The law of the place where the act or omission occurred" is another aspect

460  that governs liability.  *See 28U.S.C. § 1346(b)(1).*  Under these circumstances, the

461  United States is equivalent to a private citizen who is subject to the laws of the place

462  where the injury occurred.  *See* 28 U.S.C.A. § 1346(b)(1) (West 2003 & Supp. 2006).

463  In this case, because the misconduct occurred in Washington, the substantive law of

464  Washington State is applied.  *See Matthews v. U. S.*, 825 F.2d 35, 36 (4th Cir. 1987);

465  *see also Piggott v. U. S.*, 480 F.2d 138, 140 (4th Cir. 1973).

466        Washington State law is quite clear regarding psychologists engaging in

467  sexual misconduct.  To ensure clarity, the State has gone so far as to separate

468  psychologists from other health care providers, providing them with their own rules

469  for sexual misconduct.  WAC 246-924-358 states, "A psychologist shall never

470  engage, or attempt to engage, in sexual misconduct with a current patient, client, or

471  key party, *inside or outside* the health care setting."  It further states, "After the

472  termination of the psychology services, the psychologist shall not engage, or attempt

473  to engage...[sexual misconduct]...with a patient or client for five years or with a key

474  party for two years." It also states that if an imbalance of power or influence the

475  psychologist shall "never engage, or attempt to engage" in sexual misconduct. WAC

476  246-924-358 also precludes "suggesting or discussing the possibility of a dating,

477  sexual or romantic relationship after the professional relationship ends." This is

478  something that Phelps discussed with Campbell on many occasions.

479  **Outpatient**

480       Campbell alleges that once he was discharged from the Seattle VMAC on

481  September 12, 2005, while in session he told Kimber VanGoda ("Vangoda") of the

482  connection Campbell felt he shared with Phelps while in Seattle. Campbell alleges

483  his outpatient psychologist did not relay her knowledge of the relationship to

484  anyone within VA or make note of it in her official *Progress Notes*. As a result, no

485  one spoke to Phelps, preventing future harm to Campbell. If VanGoda had followed

486  policy, the relationship with Phelps would never have occurred. "All VA employees

487  with knowledge or information about actual or possible violations of criminal law

488  related to VA programs...shall immediately report such knowledge or information to

489  their supervisor, any management official..." *See Title 38 - § 1.201*. Campbell asserts

490  VanGoda was negligent in failing to report her knowledge of the Campbell Phelps

491  interaction.

492       VanGoda, in fact, gave inaccurate information to Campbell that likely delayed

493  his reporting of his abuse. (Investigation Certificate, March 30, 2010) This delay

494  deprived Campbell of needed psychotherapy. VanGoda testified, "every once in a

495  while, he (Campbell) would come up with – or he would say to me, 'If I knew

496  something about an employee, would you have to report it?'" (VanGoda Testimony,

497  p.17) VanGoda told him that it depended on what it was, "but most likely she would

498  have to say something to somebody." (VanGoda Testimony, pp.17-18) She

499  answered Campbell's question without trying to ascertain what type of information

500  Campbell had. Campbell was discouraged by an email from Susan Helbig, Veteran

501  Advocate, forwarded by VanGoda, "...in the past where others felt the patient was

502  not receiving what was needed but when we contacted the Veteran, there were

503  pieces of the story that the person with the concern did not have in order to

504  understand the full picture." The relationship between Campbell and Phelps did not

505  fall within the mandatory reporting requirements of the Washington Administrative
506  Code or the APA. In this respect, VanGoda may have allowed the emotional injury to
507  Campbell to increase.

508  **Accreditation**

509  The Commission of Accreditation of the American Psychological Association
510  ("APA") accredits the VA Puget Sound Health Care System Internship program; more
511  specifically they accredit the PTSD program at *7 West* where Phelps was employed.
512  The accreditation agreement is made between APA and VA; the post-doctoral intern
513  is not party to the arrangement. Once accredited, the Interns develop their own
514  agreements with VA, but under guideline set by the APA. Despite the fact that VA is
515  the organization that obtained the accreditation, once an internship is accepted, he
516  or she must abide by APA standards.

517  An agreement with APA benefits VA in several ways. Accreditation is the
518  external mark of quality and high standards. It ensures delivery of safe, high quality
519  health care based on standards and processes devised and developed by health care
520  professionals. It is also a public recognition of achievement by healthcare
521  organization, of requirements of national healthcare standards. Other very
522  important benefits of accreditation are it attracts quality clinicians into the VA
523  system, funding agencies use accreditation as a basis for determining eligibility and
524  it's a framework and support system to help meet local, state, and federal
525  requirements. Campbell asserts VA's agreement with APA and their acceptance of
526  associated benefits binds VA to APAs requirements.

527  There are many requirements VA must comply with in order to maintain
528  accreditation. These include the manner in which post-doctoral interns are
529  supervised, training programs, clerical and technical support, and physical facility
530  and training setting. In terms of the Ethics Standards, they are clearly spelled out in
531  APA's manual, Guidelines and *Principles for Accreditation of Programs in Professional*
532  *Psychology*. As a participant in a fully accredited program, staff supervisors and
533  postdoctoral interns operated under a widely accepted set of ethical principles.
534  These were available in APA's *Ethical Principals of Psychologists and Code of Conduct*.

17

535    In 2005, when Campbell was hospitalized at the Seattle VAMC, the hospital
536 was operating under APA's ethical principals that became effective in 2002.
537 During Campbell's hospitalization, he alleged that Phelps was not supervised
538 adequately and VA did not adequately address the manner in which an Intern
539 should interact with a veteran within an unsupervised session. Daily sessions
540 between Campbell and Phelps were never attended or spot-checked by a supervisor
541 and frequent visits to his hospital room were never monitored. Campbell asserts
542 that multiple superiors did not provide the necessary continuity needed to
543 supervise Phelps. Campbell also asserts that Phelps behavior of intimacy building in
544 session, while an effective tool to get Campbell to express himself, was
545 inappropriate because it created a degree of closeness between Campbell and
546 Phelps, uncommon in a therapist/patient relationship. Her emotional outbursts and
547 sharing of personal stories set the stage for future abusive behavior. Lack of
548 monitoring and supervision failed to detect her inappropriate behavior while in
549 session. Campbell asserts that a seasoned, licensed psychologist would have
550 recognized the potential harm in her behavior. APA's manual titled, *Guidelines and*
551 *Principles for Accreditation of Programs in Professional Psychology* ("GP") states
552 "...supervision is regularly scheduled and sufficient relative to the resident's
553 professional responsibility. Campbell does not contest Phelps was supervised, just
554 the frequency and manner in which it was done was inadequate. The Implementing
555 *Regulations* ("IR") for the GPs clearly indicates that monitoring professional services
556 offered to clients is a requirement of Phelps' supervisor. Campbell alleges his
557 sessions were never attended. Therefore, Campbell asserts Phelps could not have
558 been adequately monitored. The supervisor "...has the simultaneous purposes of
559 enhancing the professional functioning of the more junior person(s); monitoring the
560 quality of professional services offered to the clients that she, he, or they see; and
561 serving as a gatekeeper for those who are to enter the particular profession."
562 In addition to the lack of supervisor while in session, Phelps' conduct could be
563 considered a violation of policy under her "scope of employment." Based on the
564 same argument that APA accreditation, binds both VA and Phelps to APA rules,
565 physical sexual contact is prohibited. Sexual "contact," however, is not a

566   requirement for being an unethical, exploitive relationship. "Psychologists do not

567   exploit persons over whom they have supervisory, evaluative, or other authority

568   such as clients/patients..." (*APA Ethics Code 2002 3.08*). This citation separates

569   exploitation from sexual relationships but at the same time links the two together.

570   Phelps clearly violated this by telling Campbell personal stories about her life and

571   accepting gifts. Phelps in session behavior can be viewed as misconduct that

572   stopped short of sexual contact. Some courts have recognized that therapist

573   malpractice may arise out of such boundary violations as socializing, gift-giving, and

574   even telephoning, notwithstanding the lack of sexual contact. *See, e.g.,* Zipkin v.

575   Freeman, 4 36 S.W.2d 753 (Mo. 1968); Linda Jorgenson, Steven B. Bisbing, and

576   Pamela K. Sutherland, *Therapist-Patient Sexual Exploitation and Insurance Liability,*

577   27 TORT & INS. LAW J. 595, 609-611 & nn 114-118. (Spring 1992).

578   Such boundary violations often set the stage for sexual misconduct. {FN *See*

579   Thomas G. Gutheil, M.D. and Glen O. Gabbard, M.D., *The Concept of Boundaries in*

580   *Clinical Practice: Theoretical Risk-Management Dimensions,* 150 AM. J. PSYCHIATRY

581   188 (Feb. 1993).

582   Lastly, under "Introduction and Applicability" of the 2002 Code of Ethics, it

583   states the code "...only applies to psychologists' activities that are part of their

584   scientific, education, or professional roles as psychologists." The Ethics Code also

585   states, "Psychologists do not engage in sexual intimacies with former

586   clients/patients for at least two years after cessation or termination of therapy."

587   (10.08(a) APA Ethics Code). Even though, the code only applies to Phelps' work-

588   related functions, it follows that the "no-contact" element of the Ethics Code applies

589   only if Campbell is no longer under direct care. Campbell asserts the two year

590   contact prohibition should not be ignored simply because he was not under Phelps

591   direct care. Phelps had an obligation under State Law and the APA Ethics Code to

592   avoid contact with Campbell and VA's accreditation obligated VA to enforce APA

593   code where feasible; "[t]he training program abides by the accrediting bodies

594   published policies and procedures...". (APA Postdoctoral Residency Program Self-

595   Study Instructions) Since there was a contractual obligation for VA and a legal and

596   ethical obligation for Phelps, Campbell asserts the two-year period following
597   hospitalization was within Phelps' "scope of employment."
598         Campbell asserts it was feasible to assume VA should have known about the
599   relationship. It was clear in 2005 that some level of communication was occurring
600   between Campbell and Phelps. In two e-mails dated July 15, 2009, VanGoda
601   acknowledged recalling an interaction.

602   **Supervision**

603         McCutcheon was Phelps direct supervisor. Of the 17 days Campbell was at *7*
604   *West*, McCutcheon was not present for 10 days and unavailable to provide direction
605   to Phelps. Regarding the general supervision of Post-doctoral Interns, it is required
606   that 50% of supervision be conducted by a licensed psychologist. The remaining
607   50% may be conducted by a psychiatrist with a minimum of 2 years of post-licensed
608   experience or 3 years experience beyond residency. (*WAC 246-924-059*) Phelps
609   direct supervisor is a McCutcheon licensed clinical psychologist with 29 years
610   experience. Kothari replaces McCutcheon as intern supervisor when he is away.
611   She is a psychiatrist with 15 years experience. During Campbell's *7 West*
612   hospitalization, his post-doctoral healthcare provider was supervised 41% of the
613   time by a psychologist, and 59% by a psychiatrist.

614         In the investigation dated March 30, 2010, McCutcheon testified that Kothari
615   provided regular, scheduled supervision, however Kothari testified she only
616   provided it when requested. (Kothari Testimony, pp.10-11) Kothari further
617   testified to not knowing the rules regarding supervision of Interns. (Kothari
618   Testimony, p.17) When McCutcheon was present, Phelps received daily one-on-one
619   supervision. (McCutcheon Testimony, pp.69-70) When he was gone for 10 days,
620   Phelps was suddenly without guidance, receiving only multidisciplinary group time
621   in the mornings.

622         Phelps was a new Intern, joining *7 West* the last week of August.
623   (McCutcheon Testimony, p.19) Campbell checked into *7 West* on September 12,
624   2005. This meant for 10 of the 17 days Campbell was hospitalized, Phelps practiced
625   without regular supervision. This failure to supervise allowed Phelps greater
626   latitude to build intimacy while in session that later led to the sexual relationship.

627  With proper supervision, her questionable techniques could have been discovered.
628  There are two ways to discover if an Intern is building intimacy during session with
629  a patient by disclosing too much information, direct observation and self-reporting.
630  (Tarver Testimony, p.8)  With McCutcheon absent, and his replacements failing to
631  provide the regular direction he expected, Phelps was given too much latitude.
632  Kothari only provide as needed supervision when requested. (Kothari Testimony,
633  p.11)  Without daily one-on-one supervision, it was very likely being an Intern in
634  her first rotation, even if she was having transference issues, she wouldn't ask for
635  help. (Kothari Testimony, p.17)  Lastly, Kothari believes it is very possible Phelps
636  would not come to her for help because Interns did not want to "bother" supervisors
637  when they were not on the floor. (Kothari Testimony, p.18)

638  **Injury**

639       Campbell alleged problems Erectile Dysfunction began after his relationship
640  with Phelps and became progressively worse.  VA has prescribed him medication for
641  the problem for well over 2 years.  He also asserts to purchasing additional
642  medication for daily use on his own.  Campbell claims he equates sex with trauma
643  and he tends to detach, and as a result can't focus during intercourse.

644       Campbell feels emotional anguish as a result of Phelps actions.  Growing up,
645  Campbell lived in an environment of severe neglect.  He was verbally abused on a
646  daily basis and physically abused almost as often by his father.  When Campbell was
647  about fourteen years old, his mother sexually abused him.  Twelve years of his
648  childhood was spent surviving the worse life has to offer.  Then Campbell went to
649  Iraq.  When he returned home with problems, Campbell was sent to the Seattle
650  VAMC.  He was assigned Phelps as his in-patient therapist.  Phelps learned about
651  Campbell's Childhood mental, physical, and sexual abuse as a child but in Campbell's
652  words, "She was still willing to take complete advantage of me while I was in
653  drugged and disadvantaged state."  Campbell claims Phelps knew he was susceptible
654  to future abuse because of his past and was aware her actions were potentially
655  damaging, but she didn't seem to care.  Campbell feels as though she used her

21

656    training to seduce him while he was unable to protect himself.  This knowledge has
657    led to intense depression and anxiety to the point of suicidal ideation.

658        Campbell's emotional distress, in part, comes from the knowledge that his
659    psychologist used him in a horrible way when she was suppose to be a person that
660    could be trusted implicitly.

661        As a result of Phelps misconduct, Campbell has developed a lack of trust for
662    female health practitioners.  Campbell has a fear the information will be used in an
663    inappropriate way or he'll be taken advantage of in some other way.  VanGoda,
664    Campbell's outpatient psychologist, had noticed this behavior and commented on it
665    many times while in session and made note in his *Progress Notes*.

667        "[V]et evasive as he tends to be uncomfortable" (Jan. 18, 2007).
668        "[D]ifficult to get vet to spontaneously communicate" (Aug. 7, 2007).
669        "[V]et had not talk for months" (Sept. 12, 2007).
670        "[T]akes direct questions from this writer to get information from vet" (Sept. 12, 2007).

672        Campbell was able to share the basics of his experiences but unable to share
673    details and the most sensitive things that evoke emotion.  He was afraid of the
674    psychologist's emotions.  Campbell's inability to communicate has made treatment
675    of his psychological problems more difficult.  This problem continues to this day,
676    and in fact, has gotten worse since the relationship with Phelps was exposed.
677    VanGoda has worked with Campbell since 2005, but once he told her of his
678    experience with Phelps, despite the fact he was experiencing a traumatic event, it
679    was at that moment she chose to tell him that he could no longer see her except on
680    an on-call basis.  This created immediate distrust since it was VanGoda who
681    suggestion Campbell reconsider filing a complaint against Phelps in the first place.

682        Campbell feels severe emotional [pain and suffering] distress whenever he
683    sees a person with similar characteristics as Phelps.  If Campbell sees a woman that
684    is wearing similar rimmed glasses, or wearing certain conservative clothing, or talks
685    or walks a certain way, it brings back memories that he wants to forget but can't.
686    According to Campbell, being forced to recall another person that has taken

687   advantage of you is nothing short of a continuation of the original abuse.  Simple
688   things like going to the post office, the mall, looking at a magazine, or simply
689   watching T.V. can cause pain.
690           It wasn't that long ago that Campbell fully realized the relationship was truly
691   wrong.  He was in a state of denial; He blocked it out.  Campbell tried to forget.  *See*
692   *Kubrick, 444 U.S. at 123.*  It is only now that he is able and willing to admit the
693   relationship ever happened and speak about the difficulties it has caused.
694
695
696   _____
697   Signature of Plaintiff

This information has been disclosed to you from records whose confidentiality is protected by Federal Law. Federal Regulation [42 CFR. Part 2] prohibits you from making any further disclosure of it without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is NOT sufficient for this purpose.

**Department of Veterans Affairs**
**Veterans Health Administration**
**VA Puget Sound Health Care System**
**Completion of Investigation Certificate**

I have conducted a review of the attached summary report of investigation dated March 30, 2010.   I have reviewed the Administrative Investigative Board summary report of alleged inappropriate conduct of Psychology Intern/Fellow Lori Phelps with a Veteran patient at VA Puget Sound Health Care System in accordance with VA Handbook 0700.   This investigation was convened by Acting Director Dewayne Hamlin's charge letter dated January 28, 2010.  A review of the report was extended to perform a thorough legal review with respect to recommendations and conclusions as outlined in the summary report.

I have directed that a copy of this report be forwarded to the Facility Director at VA Medical Center in Madison, Wisconsin for review of these findings, review of VA rules, regulations, and policies, a review of lessons-learned and for appropriate administrative review.

 I certify that this report has been reviewed for compliance with VA Directive and Handbook 0700, and the subject of the report has been properly investigated.

DeAnn Lestenkof
Acting Director (Convening Authority)

## Department of
## Veterans Affairs

# Memorandum

Date: March 30, 2010

From: Administrative Board of Investigation

Subj: Board of Investigation:  Alleged Inappropriate Contact

To: Director, VA Puget Sound Health Care System (663/S-00)

**1a. Authority:**  The Administrative Investigation Board has completed its investigation as directed by your memorandum dated January 28, 2010 and as amended February 8, 2010.  All documents, memoranda, reports and records generated by and included in this investigation are strictly confidential.

**1b.  Scope:**  The scope of this investigation was to take sworn testimony and to assess:

   a.  Did Lori Phelps engage in an inappropriate relationship with a patient in her capacity as an employee of the VA Puget Sound Health Care System, September 2005 through September 16, 2008?

   b.  Were her supervisors negligent in performing their supervision duties?

**1c.  Board Members:**

   a.  Rose Burke, RN, Chair
   b.  David Kerner, Ph.D., Clinical Psychologist, Board Member
   c.  Cynthia Edwards, RN Board Member

**1d.  Witness Interviewed:**

   a.  Stephen McCutcheon, PhD., Clinical Psychologist, Seattle Division
   b.  Robert Barnes, MD, Psychiatrist, Seattle Division
   c.  Lori Phelps, PhD., Clinical Psychologist, Madison VA, (Wisconsin)
   d.  William Campbell, Patient
   e.  Paul Spartaro, RN, Clinical Nurse Specialist, American Lake Division
   f.  Kimberly VanGoda,PhD., Psychologist, Former Employee of American Lake Division
   g.  David Tarver, Ph.D., Psychologist, Seattle Division
   h.  Rhonda Williams, Ph.D., Clinical Psychologist, Seattle Division
   i.  Matthew Jakupcak, Ph.D., Clinical Psychologist, Seattle Division
   j.  Sonali Kothari, MD, Psychiatrist,  Seattle Division
   k.  Tracy Simpson, Ph.D., Clinical Psychologist, MIRECC, Seattle Division
   l.  Amy Morris, Ph.D., Clinical Psychologist, American Lake Division
   m. Dale Smith, Ph.D., Clinical Psychologist, Deputy Director, PTSD Service Line, American Lake Division

**1e.  Relevant Material Reviewed:**

a. Exhibits appended to testimony
b. Attachment 1:  Letter from Peterson, Johnson & Murray dated March 4, 2010 containing 33 pages of copied emails submitted by Dr. Phelps at the Board's request (dated 30 Aug 2006 – 28 Dec 2008).


**1f.  Significant procedural issues:**

a.  The Board encountered several procedural issues in trying to interview many of the witnesses.  One of the potential witnesses (Dr. McFall) was out of the country and unavailable for interview.  Dr. McCutcheon was in Florida, necessitating interview by telephone on two separate occasions due availability of the V-TEL link for Dr. Phelps.  Dr. Phelps had moved to Madison, Wisconsin necessitating interview by V-TEL.  Another witness' primary practice area was at America Lakes, which necessitated cancelling clinic hours to appear for our interviews.  Another witness was no longer employed by the VA, but was willing to come in and testify during a very narrow time period due to child care issues.

b. Although a transcription service was used for witness testimony, it took almost thirty days for completed return of all witness testimony.

c.  The emails referred to above as Exhibit 1 were requested during Dr. Phelps' interview on 09 February 2010, but not mailed by her representative to Ms. Wade at VA Puget Sound Healthcare System until 04 March 2010.  Board members did not receive copies of these documents until 19 March 2010.  This created additional delay in the final Board Summary Report being prepared.

**2.  Findings of the Facts:**

**a.  The allegation that Lori Phelps did engage in an inappropriate relationship with a patient in her capacity as an employee of VA Puget Sound Healthcare System, September 2005 through June 2007 (as amended) is sustained.  Dr. Phelps left the Seattle VAMC in June 2007, but continued her employment with the VA at the Madison (WI) VAMC. Her contact with Mr. Campbell continued through December, 2008.**

i. Dr. Phelps testified that she and Mr. Campbell began a benign email relationship a few weeks after his discharge from the inpatient PTSD ward (7-W) in August 2005.  This email contact continued in this form until approximately August 2006 (Phelps, pp. 9-38).

ii. Dr. Phelps testified that her relationship with Mr. Campbell became sexual in nature around November-December, 2006 while she was in her first Fellowship year at VA Puget Sound (Phelps, p. 47). Although from the copy of emails in Exhibit 1, Mr. Campbell was sending

nude pictures of himself to Dr. Phelps as early as October 2006 (Exhibit 1, first page of emails, 2nd email).

iii. Dr. Phelps testified that she maintained an email relationship with Mr. Campbell after she moved to Madison, Wisconsin in June 2007 and continued to communicate with him through December 2008 (Phelps, pp. 47-55). In an email dated December 27, 2008 title "Question", Mr. Campbell states that Dr. Phelps acknowledged "early on how unethical it was" for her to engage in any type of relationship with him (Attachment 1, p. 33, email 2). In her response to this email, Dr. Phelps states, "I honestly don't know what was going through my mind" (Attachment 1, p. 33, email 3). In an email dated December 28, 2008, Dr. Phelps responds to Mr. Campbell's questions about why a psychologist has sex with a patient with the following comment "You're right. A psychologist should not do that under any circumstances." (Attachment 1, p. 33, 2nd email).

iv. William Campbell's testimony, while less detailed, corroborates Dr. Phelps testimony (Campbell, pp. 4 – 49).

v. Washington State Administrative Code (WAC) 246-16-100 prevents any type of sexual contact between a "health care provider and a former patient or client for a period of two years after the provider-patient relationship ends" (WAC 246-16-100 (3); Exhibit 2, Exhibit 5). Even though Dr. Phelps was an intern and then a Fellow during this time frame, as long as she was practicing in Washington, her conduct would be governed by the Washington Administrative Code.

vi. Membership in the American Psychological Association commits members and student affiliates to comply with the standards of the APA Ethics Code. Lack of awareness or misunderstanding of an Ethical Standard is in itself not a defense to a charge of unethical conduct. The Code prohibits "sexual intimacies with former clients/patients for at least two years after cessation or termination of therapy", and after that only "in the most unusual circumstances" (APA Code 10.08). Dr. Phelps sexual relationship with Mr. Campbell was well within the prohibited two-year period.

**b. The allegation that her supervisors were negligent in performing their supervision duties is not sustained.**

i. Dr. Phelps testified that she only informed her supervisor, Dr. McCutcheon of one email from Mr. Campbell. This was actually the

3

second email that Mr. Campbell had sent her but she portrayed it as the first email she had received from him to Dr. McCutcheon (Phelps, p. 26). Together Dr. McCutcheon and Dr. Phelps authored a reply back to Mr. Campbell and Dr. McCutcheon sent an email to Dr. VanGoda (Mr. Campbell's primary psychologist) letting her know about this interaction (McCutcheon, pp. 26-27).

ii. Dr. Phelps further testified that she did not tell Dr. McCutcheon about the book *Silk* she had received as a gift from Mr. Campbell. She stated that she "was afraid she would get in trouble" (Phelps, p. 27).

iii. Dr. Phelps received another email from Mr. Campbell stating something to the effect that he would not be allowed on the inpatient PTSD unit anymore. She replied to this email that he would be allowed treatment there and she "wouldn't be there anyway" (Phelps, p. 29). Dr. Phelps stated that she told Dr. McCutcheon about this email and he told her that she "shouldn't have and that he wrote that down and said he was going to put it in my folder or chart or whatever" (Phelps, p. 29).

iv. Dr. Phelps testified that she did not disclose that Mr. Campbell had contacted her and that she had responded to him with anybody (Phelps, p.34).

v. Dr. McCutcheon testified that he and Dr. Phelps talked about the above email incident during supervision the entire intern year and that Dr. Phelps dealt with the emotional turmoil surrounding her own feelings and the anxiety around her evaluation (McCutcheon, pp. 28-30). He stated that he also spoke with Dr. Phelps at some length about this episode when she was applying for fellowship. Dr. Phelps told him that she had gotten therapy and was doing much better. (McCutcheon, pp. 39-40).

vi. Dr. McCutcheon testified that he brought up the above incident during the quarterly supervisor's meeting so that each supervisor working with an intern would be aware of a potential problem area. (McCutcheon, pp. 31-32). Dr. McCutcheon also mentioned this to Dr. Correale, Dr. Phelps' preceptor during her intern year (McCutcheon, p. 33), so Dr. Phelps would have a non-supervisory person to talk with if she chose to.

## 3. Credibility Assessment:

According to Webster's Online Dictionary, "credibility" is defined as: *the quality or power of inspiring belief.* In any type of investigation, the credibility all witnesses must be established and when conflicting testimony is given, the credibility of the one witness over another must be assessed. In the present case, conflicting testimony is not really present however the Board believes it is important to look at the credibility of two of the principle parties in further detail.

4

a. **Dr. Lori Phelps:** Dr. Phelps' testimony about events occurring in late 2005 and early 2006 is a bit sparse. However, the Board believes this is consistent with descriptions of her demeanor by Dr. McCutcheon during this timeframe. Dr. Phelps' recollection of events occurring in late 2006 through present is consistent with testimony and emails from other sources; the fact that Dr. Phelps admits to having an inappropriate relationship with Mr. Campbell leads this Board to conclude that Dr. Phelps is being truthful.

b. **William Campbell:** Mr. Campbell's testimony of the events in question is corroborated by the testimony of Dr. Phelps, Dr. McCutcheon, Dr. VanGoda, and Mr. Spataro. He has told his version of the events many times in many formats and the facts remain the same. Therefore, this Board concludes that Mr. Campbell has given truthful testimony as well.

4. **Conclusions:**

a. Dr. Lori Phelps did engage in an inappropriate relationship with former patient William Campbell during the term of her employment at the VA Puget Sound Health Care System, September 2005 through September 2008, as amended.   As previously mentioned, Dr. Phelps was employed at the Seattle VAMC September 2005 through June 2007, but her email contact with Mr. Campbell continued through December 2008. The length of time of the relationship between Dr. Phelps and Mr. Campbell was unknown at the time this Board was chartered or convened.

b. The supervision of Dr. Lori Phelps by the Psychology and Psychiatry staff at VA Puget Sound Health Care System during the term of her employment as a Psychology Intern and later as a Psychology Fellow, September 2005 through June 2007 as discussed above was appropriate.

5. **Incidental Findings:** The Board would like to take this opportunity to comment on four additional findings:

a. *There appears to be confusion and miscommunication between Dr. McCutcheon and Dr. Kothari about how trainees are supervised when Dr. McCutcheon's is away, something that happens regularly. Dr. McCutcheon testified that Dr. Kothari provides regular, scheduled supervision in his stead. However, Dr. Kothari testified that she provides supervision only if the trainee initiates it. Dr. Kothari, a psychiatrist, also testified that she does not know what the rules are regarding providing supervision to psychology interns. Dr. McCutcheon was away for approximately 10 days of Mr. Campbell's 17-day inpatient stay on ward 7-W, which was when Dr. Phelps met and provided therapy to Mr. Campbell. At that time, Dr. Phelps was a brand-new intern,*

having started her training only a month or so earlier. Thus, during a significant percentage of the time that Dr. Phelps was forming an emotional bond with Mr. Campbell, that would later lead to a sexual relationship, she was not receiving as much direct supervision as was expected. Given the available evidence, the Board considers it unlikely that a couple of hours of scheduled supervision would have made a difference in the eventual course of events in this case. However, there does appear to be a need to better formalize the supervision structure during primary supervisor absences.

**b.** Dr. VanGoda gave inaccurate information to Mr. Campbell which likely delayed his reporting of this abusive relationship and thus deprived him of psychotherapy about it. She then may have provided inadequate resources to him once he did make the disclosure. Dr. VanGoda testified "every once in a while, he (Mr. Campbell) would come up with—or he would say to me, 'If I knew something about an employee, would you have to report it?'" (VanGoda, p.17). Dr. VanGoda told him that it depended on what it was, "but most likely she would have to say something to somebody" (VanGoda, pp. 17-18). She answered Mr. Campbell's question without even trying to ascertain what type of information he had.  The relationship between Mr. Campbell and Dr. Phelps does not fall within the mandatory reporting requirements of the Washington Administrative Code or the APA.  In this respect, Dr. VanGoda may have allowed the emotional injury to Mr. Campbell to increase.  Eventually, Mr. Campbell did disclose his relationship to Dr. VanGoda on May 7, 2009. She testified that she started seeing him more frequently after this disclosure (VanGoda, p. 20), but her progress note from that date indicates "continue Friday Support Group [PTSD], return to clinic in 1 month for supportive therapy, and call PRN".  Dr. VanGoda testified that after Mr. Campbell made his disclosure to her, she notified the training director at American Lake and notified her supervisor, Dale Smith.  She testified she believed by notifying these two individuals and with the research Mr. Campbell was doing she had discharged her reporting duties (VanGoda, p. 21).  Mr. Campbell testified that he believes Dr. VanGoda changed his appointments to monthly and then stopped seeing him altogether because he reported his relationship with Dr. Phelps (Campbell, pp. 24-25). (Mr. Spartaro testified that Mr. Campbell felt Dr. VanGoda was encouraging him to minimize the relationship issues with Dr. Phelps by bringing up how much education it takes to become a psychologist, how hard psychologist have to work and the potential negative consequences for Dr. Phelps (Spartaro, pp. 15-16). Mr. Campbell testified that he believes Dr. VanGoda changed his appointments to monthly and then stopped seeing him altogether because he reported his relationship with Dr. Phelps (Campbell, pp. 24-25).  Mr. Campbell testified that he felt "dumped" by Dr. VanGoda

**c.** The American Lake division failed to provide timely psychological care that was promised to Mr. Campbell after Dr. VanGoda separated from the VA. Dr. Dale Smith, the Clinical Manager (Dr. VanGoda's supervisor) at American

6

Lake was in charge of reassigning patients to other providers after Dr. VanGoda's departure.  Mr. Campbell asked him (Campbell, pp. 24-25) to be reassigned, but Dr. Smith never called him. According to Mr. Spartaro, this led to Mr. Campbell feeling betrayed by the VA system (Spartaro, p. 15). In November he found his own psychologist in Olympia, whom he has been seeing regularly to help him work through issues related to Dr. Phelps (Campbell, p. 30). He is paying for this service on his own.

**d.** The VA Puget Sound Health Care System does not appear to currently have a clear policy and procedure for the reporting of suspected patient abuse.

## 6. Recommendations:

**a.** The VA Puget Sound Healthcare System should address its supervision policies and procedures and ensure that adequate trainee supervision is provided when a primary supervisor is absent.

**b.**  The VA Puget Sound Healthcare System should take additional steps to ensure that all mental health providers are aware of reporting requirements, including what information is and is not reportable, how reporting requirements interface with hospital policy, and how to appropriately discuss these issues with patient/clients.

**c.** The VA Puget Sound Healthcare System should provide fee basis psychotherapy for Mr. William Campbell if he desires and should also communicate clearly to him that he is also welcome to return to the VA for his mental health needs.

**d.** The VA Puget Sound Healthcare System should take steps to ensure that no other patients have been missed in their attempts to transfer therapists after the departure of Dr. VanGoda.  There should also be a clear plan to ensure appropriate continuity of care after the departure of other mental health providers in the future.

**e.** The VA Puget Sound Healthcare System should develop a clear policy on Patient Abuse and require all employees to become familiar with its contents and reporting scheme.

**f.** The Acting Director, Puget Sound Healthcare System should share the Facts and Conclusions of this Administrative Board with the Director, William S. Middleton VAMC, Madison, Wisconsin.

# SIGNATURE PAGE

_____
Rose Burke, RN Chairperson

_____
Cynthia Edwards, RN Board Member

_____
David Kerner, Ph.D., Board Member

## SIGNATURE PAGE

_____

Rose Burke, RN Chairperson


_____

Cynthia Edwards, RN Board Member


_____

David Kerner, Ph.D., Board Member

# SIGNATURE PAGE

_____
Rose Burke, RN Chairperson


_____
Cynthia Edwards, RN Board Member


_____
David Kerner, Ph.D., Board Member

# Department of
# Veterans Affairs

# **Memorandum**

Date:       January 28, 2010

From:      Acting Director (663/S-00), VA Puget Sound Health Care System

Subj:      Administrative Investigation of Alleged Inappropriate Conduct

To:         Rose Burke, RN, Nurse Manager, MICU, Durham VA Medical Center
            David Kerner, Ph.D., Clinical Psychologist, VA Long Beach Healthcare System
            Cynthia Edwards, Quality Specialist, Sheridan VA Medical Center


1.      You are hereby appointed to an Administrative Investigation Board (AIB).  Rose Burke, RN, shall serve as Chair of the AIB.  The AIB shall conduct a thorough investigation into the facts and circumstances regarding an allegation that Lori Phelps, a Psychology Fellow in the Addictions Treatment Center at VA Puget Sound Health Care System at the time of the allegation, engaged in an inappropriate relationship with a patient during the period June 15, 2007 through September 16, 2008.

2.      This memorandum authorizes you to inquire into all aspects of this matter; to require VA employees to cooperate with you; to require all employees having any knowledge of the complaint to furnish testimony under oath or affirmation without a pledge of confidentiality; to obtain voluntary sworn testimony from other individuals; to administer oaths and affirmations; and to gather other evidence that you determine is necessary and relevant.  These authorities are delegated for the purposes and duration of this investigation only.  Your investigation shall be conducted and reported in accordance with VA Directive 0700, VA Handbook 0700 (Administrative Investigations), and DVA/AFGE Master Agreement Article 21 Investigations.

3.      Preparations for the investigation should begin immediately.  On-site investigation should begin within two weeks of the date of this memorandum.  You shall submit your completed report and investigative file to me within 45 days of this memorandum's date, unless an extension is granted.

4.      Your report shall be submitted in standard format, as described in Chapter 6 of VA Handbook 0700.  Your report shall specifically include findings of fact and conclusions regarding the following issues:

        a.      Did Lori Phelps engage in an inappropriate relationship with a patient in her capacity as a Psychology Fellow in the Addictions Treatment Center at VA Puget Sound Health Care System during the period June 15, 2007 through September 16, 2008?

        b.      Were her supervisors negligent in performing their supervision duties?

Page 2.

Administrative Investigation of Alleged Inappropriate Conduct

5.     David A. Tostenrude, Staff Assistant to the Director, VA Puget Sound Health Care System, has been detailed as staff to the investigation.  He can be reached at (206) 768-5381 or David.Tostenrude@va.gov.

6.     Please make your travel arrangements through your local station.  VA Puget Sound Health Care System will reimburse your station for your travel and expenses.  Contact Jamie Wade, Employee/Labor Relations Specialist, at (206) 277-3665 or Jamie.Wade@va.gov for any other administrative support required.  For any necessary legal support, contact Nadine Scott, Regional Counsel, at (206) 220-6102, extension 3510, or Nadine.Scott@va.gov.  For matters requiring my personal attention, please contact me directly at (206) 277-1350.

DeWayne Hamlin

Bill—

We saw each other for the first time in about a year on your birthday last fall. It was so nice to see you after such a long time. Later I thought I should have brought you a birthday present. Been collecting movies ever since as a belated gift. Hope you like them, they're some of my favorites.

Also wanted to thank you for last fall and the start of the winter. I'm a friendly person and people always like me. But I'm usually slightly and pleasantly detached. When I met you, almost from the start I knew I did not want to be detached from you. So when we started talking on the phone every day in the fall and hanging out every couple of weeks, I felt more alive and engaged and excited than I can ever remember. And it felt really good. Not just the physical closeness, which I really liked, but the emotional closeness I felt with you was surprising and wonderful.

I will always be grateful to you for making me feel so alive and engaged and loved. So, please take care, sweet friend. And please keep in touch. I love you, and remain yours.

Lori

The necklace is one of the few pieces of jewelry that I wear. Wore it to your house once. Given to me by my sister. Always brought good luck.



MAIL
Classic

| **Re: Question** | Sunday, December 28, 2008 9:16 AM |
| --- | --- |
| **From:** "Lori" <lori.phelps@gmail.com> | |
| **To:** "Campbell" <ce4460@yahoo.com> | |

I'm sorry. I know I came off sounding glib. But like you said, your email kinda came out of the blue.

You're right. A psychologist should not do that under any circumstances.

I don't know what your theories are. Or your reasoned excuses.

I think I said this once before. I was a very guarded, closed-down person for a long time. There was something about you that woke me up, which was surprising and caught me off guard. Especially after you gave me that book. But having feelings for you is not a good reason, I know. I've been trying to figure it out.

On Sun, Dec 28, 2008 at 2:18 AM, Campbell <ce4460@yahoo.com> wrote:
> You don't know?  You're glad I got to meet the woman who raised my dog?
>
> That's it?
>
> I'm glad I met her too.
>
> Your answer does little to answer my question.  Boiled down to it's simplist form, under any
> circumstances, 'Does a pychologist have sex with a patient?'
>
> I know I was inviting but, looking back on it, I know was not in any position to make a reasoned decision.
>
> I have many reasoned excuses for my behavior but they do not matter.  I was drugged and acted
> 'outside normality' for me.  What is important is why you were willing?  Why?  I have my theries, but they
> are just theories.  It serves no purpose to detail them.  I want to hear yours.
>
>
>
> On Dec 27, 2008, at 8:36 PM, Lori <lori.phelps@gmail.com> wrote:
>
>> Bill,
>>
>> I'm really sorry to have caused you pain or been part of anything that weighs heavily on
>> you. It made me sad to read that "things are not much different on my end" because when I
>> think of you I always hope that you are happy and well.
>>
>> I honestly don't know what was going through my mind. Sorry I don't have a better answer.
>>
>> I'm so glad you got to meet the woman who raised your dog. It was probably really great

for her to meet you and to see how much the dog means to you.

I will always hope the best for you.  Lori

On Sat, Dec 27, 2008 at 6:49 PM, Campbell <ce4460@yahoo.com> wrote:
Hope you are well and happy.  Things are not much different on my end. I went to NY recently to meet the woman that raised my dog Pax. It was very nice. Convicted murderer or not, I saw a special person.

I have been thinking about what we have been through.  I can't reconcil one thing in my mind.  Early on you spoke about how unethical it was for you to engage in any kind of relationship with me but yet you did. I have thought a great deal about it and feel as though I was, to be honest, taken advantage of. I do think of you of a special person and a friend, but I don't think I would have gone as far as I did if it were not for my state of mind or the drugs I was taking at the time.

I just wondered what was going through your mind at the time that enabled the situation to esculate like it did. Can you tell me? Looking back on it, the way I see it, you were in control.  I was not in a state of mind to know the consequinces of my actions.

Anyway, it has been something on my mind that has weighed heavily.  I know up said of was unethical, but why?

Sorry to hit you with this out of the blue. Like I said, it has been on my mind.  Bill.